Joshua W. Carden, SBN 021698
JOSHUA CARDEN LAW FIRM, P.C.
16427 North Scottsdale Road, Suite 410
Scottsdale, AZ 85254
joshua@cardenlawfirm.com
(480) 454-1100
(480) 454-1101 (Fax)
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LaTonya Jones,<br><br>Plaintiff,<br>v.<br><br>Morrison Education Group, Inc.,<br><br>Defendant. | **ORIGINAL COMPLAINT**<br>**(JURY TRIAL REQUESTED)** |

Plaintiff LaTonya Jones, by and through the undersigned counsel, hereby seeks relief for race, color, and age discrimination under Title VII, 42 U.S.C. § 1981, and the ADEA as follows:

**PARTIES**

1. Plaintiff LaTonya Jones was at all relevant times herein a resident of Maricopa County, Arizona, and an "employee" of Morrison Education Group, Inc.

2. Defendant Morrison Education Group, Inc. ("MEG") is a domestic nonprofit corporation registered as a charter school in Maricopa County under A.R.S. §§ 15-101, *et seq*.

3. MEG was an "employer" of Plaintiff within the meaning of purposes of Title VII, 42 U.S.C § 2000e, *et. seq*., 42 U.S.C. § 1981, and the ADEA, 29 U.S.C. § 621, *et seq.,* at all times material to this action.

4. At all times pertinent to this Complaint, MEG's managerial employees were acting within the course and scope of their employment with MEG and under the color of state law; and as a result thereof, MEG is responsible and liability is imputed for the acts and omissions of its managerial employees, as alleged herein, under the principles of *respondeat superior*, agency, and/or other applicable law.



5. All acts alleged in this Complaint occurred in Maricopa County, Arizona.

## JURISDICTION AND VENUE

6. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 & 1343.

7. The unlawful employment practices described herein were committed within the State of Arizona, on Defendant's premises located in Maricopa County, State of Arizona.

8. Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## ALLEGATIONS COMMON TO ALL CLAIMS

9. MEG operates Sun Valley Academy, a charter school.

10. In or around March 2019, MEG hired LaTonya Jones as a Reading Specialist.

11. A reading specialist is not a teacher, but someone who works with all teachers to ensure that any children who struggle with reading have direct support in learning better reading skills.

12. Ms. Jones has over 20 years of teaching experience and has a passion for helping students learn to read.

13. Ms. Jones is African-American, with a dark complexion.

14. Ms. Jones was over the age of 40 at all relevant times.

15. Ms. Jones immediate supervisor at MEG was Tina Garrison.

16. Although African-American herself, Ms. Garrison has a very light skinned complexion compared to Ms. Jones and the other African-American employees at MEG – present and former. Is this in reference to the employees treated the same as me?

17. MEG's Executive Director Tanae Morrison is also African-American.

18. All other management positions at MEG are held by white or Hispanic individuals.

19. Ms. Jones noticed early in her employment a pattern of hostile and unsupportive behavior from Ms. Garrison that was not directed at younger employees.

20. For example, Ms. Garrison would give younger, less experienced employees permission to do things and specific job assistance that she would not provide Ms. Jones or other older employees.

21. Additionally, Ms. Garrison would raise her voice, pound her desk, and display



visible anger with Ms. Jones and other older employees.

22. Some of those older employees eventually resigned as a result of the hostile treatment by Ms. Garrison.

23. Additionally, white and Hispanic employees enjoyed significant preferential treatment in the provision of offices, phone equipment, school support materials, scheduling, flexibility, and other tangible opportunities not enjoyed by the African-American employees.

24. For example, Ms. Garrison made a specific point of "uninviting" Ms. Jones and another African-American employee from "Curriculum Night" – a school event where parents and teachers and students all got to interact.

25. Upon information and belief, Ms. Garrison excluded Ms. Jones and the other African-American from this event due to their race and/or color.

26. Soon after her employment, MEG posted a job for an "Instructional Coach"

27. As Ms. Jones was eminently qualified for the position, she applied.

28. She did not even receive an interview.

29. The position was filled by a WHITE/HISPANIC individual.

30. On another occasion, Ms. Garrison shared in a staff meeting that another African-American was "not properly certified" for the position that he was desiring, and that MEG would not allow someone into a position that they were not certified or credentialed for.

31. However, the white principal of the school was not credentialed or certified for a principal position and yet was allowed to continue in that role.

32. Ms. Jones reported Ms. Garrison's hostility and actions to Ms. Morrison, though she was not specific about the basis of Ms. Garrison's treatment of her.

33. Soon thereafter, Ms. Garrison began interfering with Ms. Jones' assignments, re-assigning her job duties to younger, white or Hispanic employees, and increasing her level of hostility in their interactions.

34. One of Ms. Jones' duties was to assist the school with DIBELS testing.

35. DIBELS (Dynamic Indicators of Basic Early Literacy Skills) is a series of short tests that assess K-8 literacy. It is a set of procedures and measures for assessing the acquisition of a set



of K-8 literacy skills, such as phonemic awareness, alphabetic principle, accuracy, fluency, and comprehension.

36. Ms. Garrison gave Ms. Jones two weeks to complete all testing of all students (more than 700 students) – an impossible task.

37. Ms. Garrison falsely reported to the principal that Ms. Jones was not testing students as directed.

38. In meeting with Ms. Garrison and the principal, Ms. Jones learned that the school had used as many as four or five individuals to conduct this testing in the past.

39. Ms. Jones has since learned that the school has also used four or five individuals to conduct this testing after her termination.

40. Although the school employed paraprofessionals who could have helped with testing, Ms. Garrison or the principal consistently diverted those individuals to other tasks and away from Ms. Jones' testing needs.

41. As Ms. Jones fell behind in meeting the impossible expectations, her anxiety increased.

42. She was handicapped in completing her duties as the authority to perform the different aspects of her job was being eroded, transferred, or eliminated.

43. When Ms. Jones spoke to HR in August 2019, the HR representative said that she should find her job duties from her employment contract.

44. Ms. Jones's anxiety increased as the people who were assigned the task of scoring tests had no DIBELS training and were making mistakes – mistakes all laid at Ms. Jones' feet.

45. One weekend in August, Ms. Jones emailed the principal, Ms. Garrison, and Ms. Morrison regarding her anxiety, her frustrations with how her job efforts had been hampered and interfered with, and how difficult it was to be made responsible for the DIBELS scoring and data when she was not allowed to actually oversee the process she was being held responsible for.

46. Ms. Morrison instructed Ms. Jones to stay home on paid leave for Monday, August 12, 2019.

47. The next day, August 13, 2019, in a meeting with Ms. Morrison and the principal,



Ms. Morrison asked if anyone had "witnessed" the hostile interactions between Ms. Garrison and Ms. Jones.

48. Ms. Jones responded "no."

49. Ms. Morrison said that the allegations against Ms. Garrison had been unsubstantiated.

50. Ms. Jones knew that to be untrue because other employees had complained about Ms. Garrison and Ms. Morrison's response had been that those employees needed to accept that behavior as Ms. Garrison's way.

51. Ms. Morrison stated that it would be "unethical" for the school to keep Ms. Jones as an employee of she felt bullied and harassed, and offered to let her out of her employment contract without penalty.

52. Ms. Jones declined to be released from her contract, and asked only that she be permitted to do the job she had contracted for and to have Ms. Garrison speak respectfully to her.

53. Ms. Morrison then nodded to the principal, who immediately informed Ms. Jones that she was terminated effective immediately.

54. Upon information and belief, the true reason for Ms. Jones' treatment and termination was because of her race, her color, and/or her age.

**Administrative Remedy Exhaustion**

55. Ms. Jones formalized a Charge of Discrimination on April 11, 2020. A true and correct copy of that document is attached as Exhibit A.

56. Ms. Jones received a notice of suit rights for her charge from the EEOC dated as mailed on September 2, 2020. A true and correct copy of that document is attached hereto as Exhibit B.

57. This Complaint is brought prior to 90 days from the date Ms. Jones received her right to sue letter.

58. All conditions precedent to the filing of this lawsuit have occurred or been satisfied.

## FIRST CAUSE OF ACTION – TITLE VII DISCRIMINATION

59. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.



60. Plaintiff is a member of two protected classes: black, African-American.

61. As described above, Plaintiff was subject to unlawful discrimination in that she was terminated, held to a different standard, and treated with more hostility than her non-African-American co-workers by her supervisors – disparate treatment because of her race.

62. Plaintiff was subject to unlawful discrimination in that she was terminated, held to a different standard, and treated with more hostility than her lighter-skinned supervisors and co-workers by her supervisors – disparate treatment because of her color.

63. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained economic damages

64. As a direct and proximate result of Defendant's conduct, Plaintiff has further sustained compensatory damages in the form of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

65. Furthermore, Defendant's conduct was malicious, done with reckless indifference, and/or performed with an evil mind so as to entitle Plaintiff to punitive or exemplary damages.

## SECOND CAUSE OF ACTION - DISCRIMINATION IN VIOLATION OF 42 USC § 1981

66. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

67. 42 U.S.C. § 1981 provides that:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.



> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

68. Plaintiff is a member of a non-white racial minority –black, African-American, and as such, had the clearly established right under 42 U.S.C. § 1981 to be free from having her contractual rights impaired or diminished because of her race.

69. Plaintiff's employment with MEG was contractual in nature.

70. Defendant discriminated against Plaintiff based on her race in the performance and modification of her employment contract, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

71. Specifically, Defendant imposed higher requirements and more stringent standards on Plaintiff than those imposed on similarly-situated white individuals, and demoted her and disciplined her more harshly than similarly-situated white individuals.

72. Furthermore, Defendant failed to provide the same level of support to Plaintiff as that given to those similarly-situated white individuals.

73. Defendant's discrimination was intentional.

74. The acts or omissions of all Defendant were moving forces behind Plaintiff's injuries.

75. The acts or omissions of Defendant as described herein intentionally deprived Plaintiff of her statutory rights and caused her other damages.

76. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of lost wages and value of benefits. Plaintiff continues to lose the value of such wages and benefits into the future.

77. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

78. Defendant's conduct was willful, malicious, done with reckless indifference, and/or



performed with an evil mind so as to entitle Plaintiff to punitive or exemplary damages against the individual Defendant.

79. It is alleged that Defendant was not a state actor as to Plaintiff's employment under the reasoning in *Caviness v. Horizon Community Learning Center*, 590 F.3d 806 (9th Cir. 2010). To the extent that this is incorrect, Plaintiff brings this claim instead under the vehicle of 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION – ADEA DISCRIMINATION

80. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

81. As described herein, Defendant violated the ADEA, 29 U.S.C. § 623(a)(1), pursuant to 29 U.S.C. § 626(b) and 29 U.S.C. § 216(b) by, *inter alia*, directly discriminating against Plaintiff and by terminating her because of her age.

82. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained actual and economic damages

83. Defendant's disparate treatment of Plaintiff was willful, in bad faith, and subjects Defendant to an equal amount of liquidated damages.

## JURY TRIAL DEMANDED

84. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

A. Declaring that the acts and practices complained of herein are in violation of federal law;

B. Directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment or employment opportunities pursuant to the Court's equitable powers;

C. Directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's unlawful actions, and make her whole for all earnings she would have received but for Defendant's discriminatory treatment, including, but not limited to, back pay, front pay, pension, and other lost benefits pursuant to the Court's equitable powers;



D. Awarding Plaintiff compensatory and punitive damages in an amount to be determined by the jury;

E. Awarding Plaintiff pre- and post-judgment interest, the costs of this action, and reasonable attorneys' fees as provided by the statutes providing the causes of action cited herein; and

F. Granting such other and further relief as this Court deems necessary and proper.

Respectfully submitted on this 30th day of November, 2020,

JOSHUA CARDEN LAW FIRM, P.C.

By: s/Joshua W. Carden
Joshua W. Carden
*Attorneys for Plaintiff*
*LaTonya Jones*

